CR 22-134 MJD/BRT

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>DORON "RON" TAVLIN,<br>AFSHIN "ALEX" FARAHAN, and<br>DAVID GANTMAN,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **INDICTMENT**<br><br>15 U.S.C. §§ 78j(b) and 78ff<br>17 C.F.R. § 240.10b-5<br>18 U.S.C. §§ 371 and 2 |

The UNITED STATES GRAND JURY charges:

**INTRODUCTION**

At times material to this Indictment:

1. Company A was a medical device company based in Ireland with global operations, which primarily operated from its executive headquarters in Minneapolis, Minnesota. Company A's common stock traded on the New York Stock Exchange.

2. Company B was an Israeli-company with a United States headquarters in Orlando, Florida, that, among other things, offered robot-assisted spinal surgery technology for use by health care providers in the treatment of patients. Company B's common stock was traded on the National Association of Securities Dealers Automated Quotations Stock Market ("NASDAQ").

3. Company B had a written policy expressly forbidding insider trading based on material, non-public information about Company B or the companies with which it did business, in connection with buying or selling stock of Company B or other companies. The policy specifically prohibited "tipping" others who might make


SCANNED
JUN 30 2022
U.S. DISTRICT COURT ST. PAUL

an investment decision on the basis of that information and pointed out potential criminal penalties for such conduct.

4. Defendant DORON "RON" TAVLIN was employed as a Vice President of Business Development at Company B from October 2017 until 2019. Prior to his employment at Company B, TAVLIN worked in other positions in the medical device industry, including as a paid consultant for Company A until approximately October 2017. TAVLIN resided in Minneapolis, Minnesota.

5. As an executive of Company B, TAVLIN owed a fiduciary duty and other duties of trust and confidence to Company B to maintain the confidentiality of any material, nonpublic information he learned and obtained during the course of his employment at Company B. Among other things, these duties required that TAVLIN abstain from disclosing to others (i.e., "tipping") any material, nonpublic information about Company B, including nonpublic information about upcoming mergers or acquisitions, a duty expressly explained to TAVLIN by Company B personnel as early as approximately December 2017. TAVLIN was aware of Company B's policy expressly forbidding insider trading, including the prohibition on "tipping" others who might make an investment decision on the basis of that information.

6. Defendants TAVLIN and AFSHIN "ALEX" FARAHAN were close personal friends and met in or around the early 2000s. FARAHAN resided in or near Los Angeles, California, but spent much of his time in the Twin Cities area of

Minnesota, where he maintained his businesses as well as multiple personal relationships with family and friends, including TAVLIN.

7. Defendants FARAHAN and DAVID GANTMAN had been friends since approximately the 1990s. GANTMAN resided in Mendota Heights, Minnesota.

8. Defendants TAVLIN and GANTMAN knew each other through their mutual friendship with FARAHAN. GANTMAN knew that TAVLIN was a senior employee at Company B.

9. As part of his employment at Company B, in or about January 2018, TAVLIN learned material, nonpublic information about advancing discussions between Company B and Company A about Company A's potential acquisition of Company B, which, if it occurred, would likely result in an increase in Company B's stock price.

10. On or about September 20, 2018, Company B publicly announced its acquisition by Company A for $58.50 per share.

11. A call option to purchase a stock provides the buyer the right, but not the obligation, to purchase a certain number of shares of a stock at a specific price (referred to as the "strike price") on a specific date in the future (referred to as the "expiration date"). A call option was "out of the money" if the underlying stock price was lower than the strike price of the option.

12. The Financial Industry Regulatory Authority ("FINRA") was a national securities association registered with the United States Securities and Exchange

Commission ("SEC"). Among other things, FINRA created and enforced certain rules that governed the securities industry, including investigating whether certain transactions involved insider trading.

**COUNT ONE**
(Conspiracy)

**THE CONSPIRACY TO ENGAGE IN INSIDER TRADING**

13. Beginning no later than January 2018, and continuing until at least in or about August 2020, in the District of Minnesota, and elsewhere,

**DORON "RON" TAVLIN,**
**AFSHIN "ALEX" FARAHAN, and**
**DAVID GANTMAN,**

defendants herein, conspired and agreed with each other, and with others known and unknown to the Grand Jury, to commit an offense against the United States, that is, to willfully use and employ, by use of any means or instrumentality of interstate commerce, directly and indirectly, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device and scheme to defraud; and (b) engaging in an act, practice, and a course of business which operated and would operate as a fraud and deceit upon any person, all in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5.

**MANNER AND MEANS OF THE CONSPIRACY**

14. It was part of the conspiracy that:

a. TAVLIN, FARAHAN, and GANTMAN agreed to misappropriate for their own personal benefit material, nonpublic information about Company B.

b. TAVLIN provided this material, nonpublic information to FARAHAN at a time when TAVLIN knew he was under a duty to protect the confidentiality of the information and not to use it—or provide it to anyone else to use—to trade in Company B's securities. TAVLIN received a personal benefit by providing this information to FARAHAN as a gift to a friend and with the intention to benefit himself and FARAHAN, and knowing that FARAHAN would use the material, nonpublic information to trade in Company B's securities. FARAHAN knew this information was material, nonpublic information that TAVLIN had disclosed to him in breach of TAVLIN's duties to Company B and for FARAHAN's use in trading Company B's securities. FARAHAN further knew that TAVLIN received a personal benefit by providing him with the information as a gift based on their friendship and with the intention to benefit TAVLIN.

c. FARAHAN, in turn, provided this material, nonpublic information about Company B to GANTMAN at a time when he knew TAVLIN was under a duty to protect the confidentiality of the information and not to use it—or provide it to anyone else to use—to trade in Company B's securities. FARAHAN received a personal benefit by providing this information to GANTMAN as a gift to a friend and with the intention to benefit GANTMAN, and knowing that GANTMAN would likely use the material, nonpublic information to trade in Company B's

securities. GANTMAN knew this information was material, nonpublic information that FARAHAN had disclosed to him from TAVLIN in breach of TAVLIN's duties to Company B and for GANTMAN's use in trading Company B's securities. GANTMAN further knew that FARAHAN received a personal benefit by providing him with the information as a gift based on their friendship.

d. As part of his employment at Company B, in or about January 2018, TAVLIN learned material, nonpublic information concerning discussions between Company B and Company A about Company A's potential acquisition of Company B, which would likely result in an increase in Company B's stock price. TAVLIN misappropriated that material, nonpublic information in violation of the fiduciary and other duties of trust and confidence he owed to Company B.

e. TAVLIN and FARAHAN further agreed that FARAHAN would pay money to TAVLIN in exchange for the material, nonpublic information that TAVLIN provided to FARAHAN, which included using proceeds of some of the profits from FARAHAN's purchases and sales of Company B securities that were the result of material, nonpublic information that TAVLIN tipped to FARAHAN.

f. TAVLIN provided FARAHAN with periodic updates about the acquisition discussions involving Company A and Company B and with advice about when FARAHAN should make corresponding transactions involving Company B stocks.

g. By at least August 2018, TAVLIN knew that discussions were advancing between Company B and Company A and that the acquisition of Company B, and resultant increase in Company B's stock price, were likely to occur. TAVLIN tipped this information to FARAHAN as a gift to his friend and with the intention to benefit FARAHAN and himself knowing that FARAHAN would use this information to trade in Company B's securities. TAVLIN instructed FARAHAN to keep the tipped information secret.

h. By at least August 2018, FARAHAN, in turn, provided to GANTMAN the same material, nonpublic information about Company A's increasingly likely acquisition of Company B. FARAHAN also instructed GANTMAN to keep the information secret. FARAHAN provided this information to GANTMAN as a gift to his friend and with the intention to benefit GANTMAN knowing that GANTMAN would likely use this information to trade in Company B's securities. Based on the information provided by FARAHAN, GANTMAN knew: (i) that the source of the information was FARAHAN's long-standing and close personal friend, TAVLIN; (ii) that TAVLIN was a senior employee at Company B; and (iii) that TAVLIN had misappropriated the material, nonpublic information from Company B in breach of a duty of trust and confidence to keep such information confidential.

i. After their receipt of material, nonpublic information about Company B, FARAHAN and GANTMAN each engaged in purchases of Company B securities in August 2018 and September 2018. On or about September 20, 2018,

Company A publicly announced that it would acquire Company B for $58.50 per share. The day after the public announcement, on or about September 21, 2018, FARAHAN and GANTMAN each sold all of their respective Company B securities for a substantial combined profit of at least $500,000.

j. After the September 20, 2018 public announcement of Company A's acquisition of Company B, TAVLIN, FARAHAN, and GANTMAN engaged in discussions amongst themselves concerning the fact that FINRA was conducting an inquiry into certain trading in Company B securities that occurred prior to the public announcement. Ultimately, TAVLIN responded falsely to FINRA's inquiry, in that he disavowed knowing any of the parties who engaged in the subject transactions involving Company B securities, which included FARAHAN and GANTMAN.

**OVERT ACTS**

15. To effect the object of the conspiracy, defendants TAVLIN, FARAHAN, and GANTMAN committed and caused to be committed the following overt acts, among others, in the District of Minnesota, and elsewhere:

a. On or about June 13, 2018, in exchange for material, nonpublic information provided by TAVLIN about Company B, FARAHAN made a $20,000 payment in the form of a check drawn on a Fidelity Investments account that FARAHAN controlled to the benefit of Individual A, who was TAVLIN's son.

b. In order to conceal the illicit nature of the payment to benefit TAVLIN's son, FARAHAN falsely stated on the memo line of the June 13, 2018 check that it was for the "Purchase of Rugs," which FARAHAN knew at the time was false.

c. On or about Friday, August 10, 2018, FARAHAN flew to Minnesota and stayed at the Minneapolis home of his friend, TAVLIN.

d. After FARAHAN's August 10, 2018 arrival at TAVLIN's Minneapolis home, TAVLIN, in breach of his duties of trust and confidentiality to Company B, provided FARAHAN with material, nonpublic information about Company A's likely acquisition of Company B, about which TAVLIN instructed FARAHAN to keep secret.

e. After FARAHAN's August 10, 2018 arrival at TAVLIN's Minneapolis home, TAVLIN, in breach of his duties of trust and confidentiality to Company B, further instructed FARAHAN to purchase quickly Company B stocks for himself and to invest on TAVLIN's behalf.

f. On or about August 13, 2018, after FARAHAN received material, nonpublic information from TAVLIN, FARAHAN purchased approximately 2,000 shares of Company B stock, which was priced at approximately $46.75 per share, for a total of approximately $93,500.

g. The same day, on or about August 13, 2018, TAVLIN and FARAHAN spoke on the phone. After their telephone call, FARAHAN purchased

approximately 2,000 additional shares of Company B stock, which was priced at approximately $47.75 per share, for a total of approximately $95,500.

h. No later than on or about August 15, 2018, FARAHAN met with GANTMAN in Minnesota. Among other things, FARAHAN tipped to GANTMAN the same material, nonpublic information about Company A's likely acquisition of Company B that FARAHAN had just learned from TAVLIN. FARAHAN informed GANTMAN that the material, nonpublic information came from TAVLIN, whom GANTMAN knew was a senior employee at Company B. FARAHAN instructed GANTMAN to keep the information secret.

i. On or about August 15, 2018, GANTMAN called Fidelity Investments, where he maintained an account. Based upon the material, nonpublic information that FARAHAN tipped to GANTMAN about Company B, GANTMAN purchased approximately 8,000 shares of Company B stock, which was priced at approximately $42.80 per share, for a total of approximately $213,850.

j. Between approximately August 16, 2018, through approximately September 17, 2018, FARAHAN continued to buy additional shares in Company B using funds he controlled in personal and business accounts maintained at Fidelity Investments.

k. Between approximately August 15, 2018, through approximately September 10, 2018, GANTMAN continued to buy additional shares, as well as call

options, in Company B using funds he controlled in a personal account maintained at Fidelity Investments.

l. On or about September 21, 2018, the day after Company B publicly announced its acquisition by Company A for $58.50 per share, FARAHAN sold all of the Company B shares that he purchased based upon material, nonpublic information tipped to him by TAVLIN. In total, FARAHAN received a profit of approximately $247,500.

m. On or about September 21, 2018, the day after Company B publicly announced its acquisition by Company A for $58.50 per share, GANTMAN sold all of the Company B shares and his entire position of call options in Company B stock that he purchased based upon material, nonpublic information tipped to him by FARAHAN. In total, GANTMAN received a profit of approximately $255,562.

n. On or about October 4, 2018, TAVLIN learned that FINRA was investigating certain trading in Company B securities that occurred prior to the September 20, 2018 publicly-announced acquisition of Company B by Company A. After TAVLIN learned of FINRA's inquiry, on or about the same day, he placed a telephone call to FARAHAN. After TAVLIN and FARAHAN ended their telephone call, FARAHAN placed a telephone call to GANTMAN.

o. On or about January 8, 2019, TAVLIN learned that FINRA's ongoing inquiry identified: (a) a list of people at Company B—which included TAVLIN—who possessed material, nonpublic information leading up to the public

announcement on September 20, 2018, of Company A's acquisition of Company B; and (b) another list of parties who traded in Company B securities prior to the public announcement on September 20, 2018, which included FARAHAN and GANTMAN.

p. Later in the day on or about January 8, 2019, TAVLIN placed a telephone call to FARAHAN. During their January 8, 2019 conversation, TAVLIN notified FARAHAN that FARAHAN appeared on FINRA's list of parties who bought Company B securities. TAVLIN told FARAHAN that he was not going to disclose his relationship with FARAHAN.

q. After TAVLIN and FARAHAN ended their January 8, 2019 telephone call, FARAHAN communicated with GANTMAN. Among other things, FARAHAN informed GANTMAN that GANTMAN's name appeared on a list of parties who bought Company B securities prior to the public announcement of the acquisition, as part of FINRA's inquiry.

r. On or about January 8, 2019, TAVLIN responded to FINRA's inquiry by falsely denying that he recognized any names on a list of persons and entities that purchased Company B securities, which included FARAHAN and GANTMAN's names.

s. On or about October 25, 2019, TAVLIN and FARAHAN met in or near Minneapolis, Minnesota. Among other things, TAVLIN asked FARAHAN to provide him with money in exchange for the material, nonpublic information that

TAVLIN had provided FARAHAN about Company B leading it up to its acquisition by Company A.

t. On or about October 25, 2019, FARAHAN provided a $25,000 payment to TAVLIN in the form of a check drawn from a Wells Fargo Bank account that FARAHAN controlled.

u. On or about August 14, 2020, TAVLIN asked FARAHAN for additional money in exchange for the material, nonpublic information that TAVLIN had provided FARAHAN concerning Company B. More specifically, TAVLIN sent FARAHAN an email message titled "Investment." Among other things, TAVLIN asked FARAHAN "to go over the accounts so we can settle up from our past activities. It's been almost two years and you will have to backtrack quite a bit. When you figure out the balance you can either write me or [TAVLIN's son] a check."

16. All in violation of Title 18, United States Code, Section 371.

**<u>COUNTS TWO through ELEVEN</u>**
(Securities Fraud and Aiding and Abetting)

17. Paragraphs 1-12, 14, and 15 of this Indictment are incorporated here.

18. Beginning on or about August 13, 2018, and continuing until on or about at least September 21, 2018, in the District of Minnesota and elsewhere,

**AFSHIN "ALEX" FARAHAN and
DORON "RON" TAVLIN,**

defendants herein, each aiding and abetting the other and being aided and abetted by others known and unknown to the grand jury, directly and indirectly, by the use

of a means and instrumentality of interstate commerce, willfully used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device and scheme to defraud; and (b) engaging in an act, practice, and a course of business which operated and would operate as a fraud and deceit upon any person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5.

19. On or about the dates below, in the District of Minnesota, and elsewhere,

**AFSHIN "ALEX" FARAHAN and**
**DORON "RON" TAVLIN,**

defendants herein, in connection with the purchase and sale of securities identified below, willfully used and caused the use of a means and instrumentality of interstate commerce, namely, the internet:

| Count | Date (on or about) | Transaction |
|---|---|---|
| 2 | August 13, 2018 | FARAHAN's purchase of 2,000 shares of Company B stock at $46.75 per share for approximately $93,500 |
| 3 | August 13, 2018 | FARAHAN's purchase of 2,000 shares of Company B stock at $47.75 per share for approximately $95,500 |
| 4 | August 16, 2018 | FARAHAN's purchase of 2,000 shares of Company B stock at $42.35 per share for approximately $84,700 |
| 5 | August 24, 2018 | FARAHAN's purchase of 500 shares of Company B stock at $47.46 per share for approximately $23,730 |
| 6 | August 24, 2018 | FARAHAN's purchase of 3,495 shares of Company B stock at $47.58 per share for approximately $166,292.10 |
| 7 | August 24, 2018 | FARAHAN's purchase of 3,000 shares of Company B stock at $47.40 per share for approximately $142,200 |

| | | |
|---|---|---|
| 8 | August 29, 2018 | FARAHAN's purchase of 2,000 shares of Company B stock at $47.25 per share for approximately $94,500 |
| 9 | September 5, 2018 | FARAHAN's purchase of 2,000 shares of Company B stock at $46.15 per share for approximately $92,300 |
| 10 | September 5, 2018 | FARAHAN's purchase of 2,000 shares of Company B stock at $46.05 per share for approximately $92,100 |
| 11 | September 17, 2018 | FARAHAN's purchase of 3,000 shares of Company stock at $48.8459 per share for approximately $146,537.70 |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

**COUNTS TWELVE through SEVENTEEN**
(Securities Fraud and Aiding and Abetting)

20. Paragraphs 1-12, 14, and 15 of this Indictment are incorporated here.

21. Beginning on or about August 15, 2018, and continuing until on or about at least September 21, 2018, in the District of Minnesota and elsewhere,

**DAVID GANTMAN and**
**AFSHIN "ALEX" FARAHAN,**

defendants herein, each aiding and abetting the other and being aided and abetted by others known and unknown to the grand jury, directly and indirectly, by the use of a means and instrumentality of interstate commerce, willfully used and employed, in connection with the purchase and sale of a security, a manipulative and deceptive device and contrivance, in contravention of Title 17, Code of Federal Regulations, Section 240.10b-5, by: (a) employing a device and scheme to defraud; and (b) engaging in an act, practice, and a course of business which operated and would operate as a

fraud and deceit upon any person, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5.

22. On or about the dates below, in the District of Minnesota, and elsewhere,

**DAVID GANTMAN and**
**AFSHIN "ALEX" FARAHAN,**

defendants herein, in connection with the purchase and sale of securities identified below, willfully used and caused the use of a means and instrumentality of interstate commerce, namely, the internet:

| Count | Date (on or about) | Transaction |
|---|---|---|
| 12 | August 15, 2018 | GANTMAN's purchase of 410 shares of Company B stock at $42.80 per share for approximately $17,548 |
| 13 | August 15, 2018 | GANTMAN's purchase of 1,590 shares of Company B stock at $42.80 per share for approximately $68,052 |
| 14 | August 15, 2018 | GANTMAN's purchase of 3,000 shares of Company B stock at $42.75 per share for approximately $128,250 |
| 15 | August 17, 2018 | GANTMAN's purchase of 101 call options for Company B stock at strike price of $50 for approximately $23,233, with expiration date of November 16, 2018 |
| 16 | September 4, 2018 | GANTMAN's purchase of 100 call options for Company B stock at strike price of $50 for approximately $22,000, with expiration date of October 19, 2018 |
| 17 | September 10, 2018 | GANTMAN's purchase of 100 call options for Company B stock at strike price of $50 for approximately $23,000, with expiration date of October 19, 2018 |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff(a), and Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 2.

**FORFEITURE ALLEGATIONS**

The UNITED STATES GRAND JURY further charges:

23. Counts 1-17 of this Indictment are incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C), in conjunction with Title 28, United States Code, Section 2461(c).

24. As the result of the violations of Title 15, United States Code, Sections 78j(b) and 78ff, Title 17, Code of Federal Regulations, Section 240.10b-5, and Title 18, United States Code, Section 371, as alleged in Counts 1 – 17 of this Indictment,

**DORON "RON" TAVLIN,**
**AFSHIN "ALEX" FARAHAN, and**
**DAVID GANTMAN,**

defendants herein, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation.

25. If any of the above-described forfeitable property is unavailable for forfeiture, the United States intends to seek the forfeiture of substitute property as provided for in Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

A TRUE BILL

FIRST ASSISTANT U.S. ATTORNEY
for the United States Acting
Under Authority Conferred by
28 U.S.C. § 515

FOREPERSON