UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 22-134(1) (DWF/JFD) |
| Plaintiff, | |
| v. | MEMORANDUM OPINION AND ORDER |
| Doron "Ron" Tavlin, | |
| Defendant. | |

## INTRODUCTION

This matter is before the Court on Defendant Doron Tavlin's motion for judgment of acquittal and motion for a new trial. (Doc. Nos. 242, 243.) The United States of America (the "Government") opposes both motions. (Doc. No. 252.) For the reasons discussed below, the Court respectfully denies both motions.

## BACKGROUND

Tavlin was charged with one count of conspiracy to engage in insider trading and ten counts of securities fraud and aiding and abetting securities fraud. (Doc. No. 1.) Tavlin was indicted with two other co-defendants, Afshin Farahan and David Gantman. (*Id.*) Farahan pled guilty and Gantman and Tavlin proceeded to trial together. After a two-week trial, a jury convicted Tavlin on all counts and acquitted Gantman. (Doc. No. 214.) Tavlin now moves for judgment of acquittal and a new trial. (Doc. Nos. 242, 243.)

# DISCUSSION

I.  **Motion for Judgment of Acquittal**

Rule 29 of the Federal Rules of Criminal Procedure provides that a court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). When deciding a motion for judgment of acquittal, the Court views the evidence and all reasonable inferences from it in the light most favorable to the jury's verdict. *United States v. Seibel*, 712 F.3d 1229, 1236 (8th Cir. 2013). If there is an interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt, the verdict must be upheld. *United States v. Espinoza*, 885 F.3d 516, 520 (8th Cir. 2018).

Tavlin argues that acquittal is appropriate because (1) the Government did not prove that Tavlin, Farahan, and Gantman engaged in a conspiracy together; (2) the conspiracy conviction constitutes a variance and it prejudiced Tavlin; and (3) there was insufficient evidence for a jury to conclude that Tavlin disclosed to Farahan material, nonpublic information.

A.  **Conspiracy Conviction**

The indictment charged Tavlin, Farahan, and Gantman with conspiracy to engage in insider trading. The indictment stated that "Tavlin, Farahan, and Gantman agreed to misappropriate for their own personal benefit material, nonpublic information about Company B." (Doc. No. 1 at 5.) Tavlin argues that the evidence presented at trial did not support the existence of a single conspiracy involving himself, Farahan, and Gantman.

2

He argues that the evidence demonstrated that Tavlin "did not agree to, foresee, or desire Gantman's trading activity to occur." (Doc. No. 242 at 9.)

Courts have laid out "three hypothetical avenues" for establishing a single conspiracy to commit insider trading: "(1) if the scope of the trading agreement were broader 'to include trading by or for persons other than the small group of conspirators'; (2) if the conspirators reasonably foresaw, as a necessary or natural consequence of the unlawful agreement, information being passed to remote tippees; and (3) actual awareness of the remote tippees." *United States v. Geibel*, 369 F.3d 682, 690 (2d Cir. 2004) (internal quotations and citation omitted).

The Government presented minimal evidence that the scope of the trading agreement that Tavlin entered into included trading by persons other than Farahan. Significantly, as Tavlin notes, Farahan testified that Tavlin told him to "keep the information confidential" and that he "made a mistake of sharing [the information] with another friend." (Doc. No. 221 at 203.) He further testified that Tavlin had no idea Farahan was going to share the information with Gantman. (*Id.* at 204.) While the Government argues that Tavlin could have meant to keep the information within a small circle, the only evidence of this is that Tavlin had given friends advice about stocks in the past. But even the Government acknowledged during closing that the tip about Mazor (Company B) "was different than the previous ones." (Doc. No. 228 at 47.) Moreover, if Tavlin knew or anticipated that Farahan would share the information with others, "he certainly would have sought additional trading profits," and there is no evidence of this. *Geibel*, 369 F.3d at 691.

3

The Government further argues that evidence at trial showed that Tavlin could have reasonably foreseen information being passed to remote tippee because he frequently provided stock and trading advice to others through Farahan. But as noted above, Farahan testified that Tavlin told him to keep the information confidential. And finally, there is no evidence of actual awareness. The Court therefore concludes that there has been a variance.

B.   **Variance**

"[W]hen a defendant is charged with a single conspiracy among multiple members, and the proof at trial shows that he conspired with some, but not all, of those members, the variance is subject to the harmless error rule." *United States v. McDermott*, 277 F.3d 240, 242 (2d Cir. 2002). Tavlin argues that the conspiracy merged with the substantive counts and the presentation of evidence related to Gantman prejudiced him.

Wharton's Rules "operates as a narrow exception to the general principle that a conspiracy and its underlying substantive offense do not merge." *United States v. Hines*, 541 F.3d 833, 838 (8th Cir. 2008). The rule "applies only to offenses that require concerted criminal activity, a plurality of criminal agents." *Iannelli v. United States*, 420 U.S. 770, 785 (1975). "Wharton's Rule, however, does not apply where . . . a crime is capable of being committed by one person." *United States v. Rashwan*, 328 F.3d 160, 164 (4th Cir. 2003). In addition, the Court considers whether "the immediate consequences of the crime rest on the parties themselves rather than on society at large." *Iannelli*, 420 U.S. 782-83.

Tavlin was charged with ten counts of insider trading in violation of 15 U.S.C. §§ 78j(b) and 78ff and of 17 C.F.R. § 240.10b-5. These laws make it unlawful for a person to use or employ a deceptive device "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). Although in this case, the scheme to defraud included Tavlin providing inside information to Farahan, who then purchased securities, the underlying substantive offense of insider trading does not require the participation of two or more people. *See United States v. Morris*, 957 F.2d 1391, 1403 (7th Cir. 1992) (concluding that Wharton's rule was inapplicable because the substantive offenses of mail fraud and misapplication of federal revenue sharing funds "may be committed by a single person"); *United States v. Ohlson*, 552 F.2d 1347, 1349-50 (9th Cir. 1977) ("[T]he applicability of Wharton's Rule depends . . . on the statutory requirements of the substantive offense."); *United States v. Nascimento*, 491 F.3d 25, 48 (1st Cir. 2007) ("Wharton's Rule is limited to instances—adultery being a prime example—in which, as a statutory matter, the completed offense necessarily involves conspiracy between the participants."); *United States v. Afremov*, No. 06-cr-196, 2007 WL 3237630, at *7 (D. Minn. Oct. 30, 3007) ("Although the scheme to defraud contained in the Indictment alleges kickback payments between Fischer, Foremost, and Afremov, the underlying substantive mail fraud offenses do not *require* the participation of two or more persons.") (emphasis in original). Because, as a statutory matter, insider trading does not require the participation of two or more people, Wharton's rule does not apply.

Moreover, securities fraud impacts those who buy and sell securities without the benefit of inside information, as well as the integrity of the market as a whole. *See*

5

*United States v. O'Hagan*, 521 U.S. 642, 653 (1997) (noting that insider trading laws "protect the integrity of the securities markets") (cleaned up).  Thus, "the harm attendant upon the commission of the substantive offense is not restricted to the parties to the agreement."  *Iannelli*, 420 U.S. at 784.  For these reasons, the Court concludes that Wharton's Rule does not apply.

Additionally, Tavlin argues that he was prejudiced by the variance.  Specifically, he asserts that evidence related to Gantman prejudiced him.  The Government argues that Tavlin was not prejudiced because the evidence at trial tracked the allegations in the indictment.  In addition, the Government asserts that the evidence at trial against Tavlin was strong.  And lastly, the Government argues that even if Gantman had not been tried with Tavlin, evidence related to Gantman "would likely have been admissible as circumstantial evidence against Tavlin."  (Doc. No. 252 at 25.)

"Where the indictment 'fully and fairly' apprises the defendant of the allegations against which he must defend, prejudice is absent and any variance is harmless error." *United States v. Buchanan*, 574 F.3d 554, 565 (8th Cir. 2009).  Here, as the Government notes, the indictment alleged that Tavlin owed a duty to Mazor, obtained material, nonpublic information about a potential acquisition, shared the information with Farahan, and did so for Farahan to use in trading securities with the intention to benefit himself and Farahan. (Doc. No. 1 at 1-5.)  The evidence at trial closely tracked these allegations in the indictment and thus the indictment put Tavlin on notice of the evidence to be presented at trial.

Tavlin has also failed to demonstrate prejudicial spillover.  Tavlin argues that the Government "repeatedly emphasized at trial inflammatory aspects of the evidence against Gantman."  (Doc. No. 242 at 16.)  But as Tavlin notes, this evidence related to Gantman only and it would not have been difficult for the jury to compartmentalize evidence that exclusively related to Gantman.  Moreover, Tavlin argues that Gantman "repeatedly emphasized his conduct in responding to FBI agents on January 8, 2021—inviting them into his home, showing them his Fidelity account—and later responding to the SEC."  (*Id.*)  In contrast, "[n]o comparable testimony was elicited with respect to Tavlin."  (*Id.*)  What Tavlin does not mention is that great care was taken so as not to inform the jury on whether Tavlin chose to speak with the FBI or not.  (*See* Doc. No. 224 at 99-102.)  The Court concludes that Tavlin was not prejudiced by spillover evidence.  Tavlin's "participation in the conspiracy . . . is easy to identify and separate from that of [Gantman], and the evidence is easy to compartmentalize."  *United States v. Chantharath*, 705 F.3d 295, 302 (8th Cir. 2013) (internal quotations and citation omitted).

    **C.**    **Material Nonpublic Information**

Lastly, Tavlin argues that there was insufficient evidence for a jury to conclude that Tavlin shared material, nonpublic information with Farahan.  "Information is material if 'there is a substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest.]"  *United States v. Rajaratnam*, 802 F. Supp. 2d 491, 498 (S.D.N.Y. 2011) (internal quotations and citation omitted).  "This inquiry is guided both by the probability that an event will occur and the anticipated magnitude of

7

the event relative to the totality of the company's activity." *Id.* (internal quotations and citation omitted). "Information becomes public when disclosed to achieve a broad dissemination to the investing public generally . . . or when, although known only by a few persons, their trading on it has caused the information to be fully impounded into the price of the particular stock." *Id.* (internal quotations and citation omitted).

Tavlin argues that the information Tavlin shared with Farahan was not material because it was too speculative. The Government provided sufficient evidence at trial that the potential merger was not speculative. As early as February 2018, Mazor and Medtronic began to discuss a potential merger. (Doc. No. 220 at 134-35.) In March 2018, Chris Cleary, the head of corporate development at Medtronic, gave the board of directors at Medtronic a preview of surgical robotics and discussed their plans to grow their spine business. (*Id.* at 255.) In June 2018, Cleary again discussed the acquisition with the board and provided "a more detailed version of the acquisition financials." (*Id.*) By July 2018, negotiations had become more serious. Cleary stressed the importance of confidentiality, as a movement in stock price could jeopardize the deal. (*Id.* at 140.) Cleary testified that around August the deal was ready to receive final approval by the board, meaning the deal was highly likely to go through. (*Id.* at 224, 259-60.)

Tavlin shared information about the acquisition with Farahan on the weekend of August 11, 2018, and less than two weeks later, on August 24, the board authorized Medtronic to pursue an acquisition and set parameters for the offer. (*Id.* at 261-62.) The board's decision and the resulting resolution was not public knowledge. (*Id.*) In

8

addition, the information regarding the merger was of great magnitude. The total acquisition price was $1.64 billion and sharing any confidential information before the deal was finalized risked jeopardizing the entire merger. (*See id.* at 267.)

Tavlin also argues that the information was public because there was "substantial public knowledge of the possibility of the merger." (Doc. No. 242 at 19.) Tavlin cites to two 2016 articles to support this assertion. The articles do not discuss any merger negotiations, both articles focus on Medtronic's partnership with Mazor, and one article even notes that Mazor "did not want to be acquired." (Tavlin Exs. 15, 19.) In contrast, the Government provided ample evidence that these merger negotiations were highly confidential and only a small circle of people were privy to any information regarding the potential acquisition. It was not unreasonable for the jury to conclude that the information Tavlin shared to Farahan regarding the potential acquisition was material and nonpublic.

Lastly, Tavlin argues that the Government should have provided an event study. An event study is just "one piece of evidence in a total mix of evidence . . . that a jury may consider when determining the materiality of non-public information." *Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 433 (S.D.N.Y. 2015). The Court concludes that, even without an event study, the Government provided sufficient evidence that the information Tavlin shared with Farahan was material, nonpublic information. The Court therefore denies Tavlin's motion for judgment of acquittal.

**II.     Motion for New Trial**

Tavlin also brings a motion for a new trial. "Upon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Tavlin asserts three main arguments for why the interest of justice demands a new trial. First, he asserts that Court erred in refusing to give certain requested jury instructions. Second, he argues that the Government "engaged in substantial and highly prejudicial misconduct in its closing argument." (Doc. No. 243 at 11.) And third, Tavlin argues that the Government engaged in additional misconduct, including suggesting that Tavlin's theory of defense was an outlier, using Farahan's guilty plea as evidence of Tavlin's guilt, and failing to correct instances of perjury.

**A.     Jury Instructions**

Tavlin challenges the jury instructions given by the Court. Specifically, Tavlin argues that "the prosecution kept out" Tavlin's theory of defense instruction. (*Id.* at 20.) In addition, Tavlin asserts that the Court should have provided instructions on a potential duty of trust and confidence that Farahan owed Tavlin.

During the charge conference, Tavlin requested a lengthy 500-word theory of defense explaining that Farahan had a duty to keep communications between himself and Tavlin confidential. The Court declined to incorporate the full theory of defense into the instructions and instead included, in part, the following:

> Tavlin and Farahan had a close, family-like relationship and pattern of sharing confidences. They were like brothers. Tavlin did not disclose information to Farahan in 2018 with the expectation that Farahan would buy or sell securities based on the information. Tavlin asked Farahan to keep their discussions confidential. Tavlin never told Farahan to trade

10

>Mazor stock, and Tavlin was completely unaware that Farahan was actively trading Mazor stock in August and September 2018.

(Doc. No. 209 at 12.)

"Jury instructions are adequate if, taken as a whole, they adequately advise the jury of the essential elements of the offenses charged and the burden of proof required of the government." *United States v. Rice*, 449 F.3d 887, 895 (8th Cir. 2006) (cleaned up).  The theory of defense Tavlin requested and the instruction the Court gave to the jury are strikingly similar to the instructions at issue in *United States v. Gansman*, 657 F.3d 85, 91 (2d Cir. 2011).  In that case, the district court similarly declined to include language in the theory of defense regarding a "relationship of trust and confidence" or related duty to "keep any confidences . . . confidential." *Id.* at 89.  Instead, the Court provided the following instruction:

>In this case, Gansman contends that he did not [provide Murdoch with insider information] with the understanding that she would use [it] to buy and sell securities.  According to [Gansman], any material nonpublic information that Murdoch may have received from him was shared with her as part of a relationship in which they shared work and personal confidences.

*Id.* at 91.

The Second Circuit concluded the instruction the district court gave was "substantially similar to the one [the defendant] requested and [] clearly informed the jury of [the defendant's] theory that he lacked the requisite intent to commit the crime with which he was charged." *Id.*  Thus, the "theory of the defense was adequately conveyed to the jury and the defendant suffered no prejudice." *Id.*

11

at 91-92. The same is true here. The instruction given by the Court adequately conveyed Tavlin's defense that he did not intend for Farahan to trade on the information. Moreover, while Tavlin argues that the Court should have provided an additional instruction explaining the duty of trust and confidence, the Court's instructions made clear that for Tavlin to be guilty of insider trading the jury had to find that Tavlin "disclosed the information with an expectation that Farahan would purchase or sell securities based on that information." (Doc. No. 209 at 27.) Tavlin was free to argue—and did argue—that given Tavlin and Farahan's close family-like relationship, Tavlin did not expect Farahan to use the information to make trades. These instructions, "taken as a whole," "adequately advise[d] the jury of the essential elements of the offense[]." *Rice*, 449 F.3d at 895 (internal quotations and citation omitted).

      **B.**    **Closing Arguments**

Next, Tavlin argues that the Government misstated the law in its closing argument. In the Government's rebuttal, the prosecution stated that Tavlin was arguing a "made-up friendship breach." (Doc. No. 228 at 169.) The Government went on to say that "[t]here is no law against a friend spilling a secret from another friend." (*Id.*) The Government stated that "there is not a shred of evidence that you heard that Mr. Tavlin told Farahan not to trade. And [] even if he had, it meant nothing under the law, as I anticipate you will be instructed by the Court." (*Id.* at 170.)

The Court agrees that these statements are not entirely accurate representations of the law. For example, the Government's assertion that it "meant nothing under the law"

whether Tavlin told Farahan to not trade on the information is misleading.  Had the jury believed that Tavlin told Farahan to keep the information secret and not trade, those facts could have demonstrated that Tavlin did not disclose the information with an expectation that Farahan would purchase or sell securities based on that information.  And while the Government is technically correct that a person cannot be held criminally liable for merely "spilling" a secret, a person can be liable for misappropriating "material nonpublic information in breach of a fiduciary duty or similar relationship of trust and confidence and us[ing] that information in a securities transaction."  *United States v. Falcone*, 257 F.3d 226, 230 (2d Cir. 2001) (internal quotations and citation omitted).  Thus, this statement was not entirely wrong but was also not a clear and accurate representation of the law.

Still, the Court concludes Tavlin was not prejudiced by these statements.  Closing arguments in this case lasted an entire day.  Tavlin points to a handful of statements that represent a small portion of the Government's argument.  The Government repeatedly stressed in its closing that Tavlin's defense—that he told Farahan not to trade and had no idea Farahan made trades—was "fundamentally at odds with the overwhelming evidence," including evidence that Tavlin discussed the plan to trade with Farahan, had financial difficulties at the time, and later asked for payment from Farahan to "settle up from past activities."  (Doc. No. 228 at 66, 171-73.)  And following the rebuttal, the Court instructed the jury if "any difference appears to you between the law as stated by counsel and that as stated by the Court in these instructions, you, of course, are to be governed by the instructions given to you by the Court."  (Doc. No. 209 at 2-3.)  Overall,

13

while the Government could have been clearer in its rebuttal regarding the law, the Court concludes that the handful of misleading statements did not prejudice Tavlin given the strength of the evidence against him and the Court's instructions to the jury.

### C. Other Allegations of Misconduct

Lastly, Tavlin argues that the prosecution engaged in additional misconduct, including suggesting that Tavlin's theory of defense was an outlier, using Farahan's guilty plea as evidence of Tavlin's guilt, and failing to correct instances of perjury.

During rebuttal, the Government asserted that jury may be "the first insider trading jury in American history where the corporate insider himself has put forth to you that very notion, conceding giving information to the friend and telling the friend [to] keep it quiet, but don't trade on it." (Doc. No. 228 at 168.) In other words, the Government noted that Tavlin "all but acknowledges that the information was nonpublic and was confidential. Why else would one say it's secret, don't trade on it?" (*Id.*) Tavlin is correct that there was no basis for the Government to conclude that this was the first case ever where an insider all but admitted to sharing confidential information. The *Gansman* case refutes that notion. 657 F.3d at 91-92. But the Court does not find this to be grounds for a new trial as the statement did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *United States v. Schneider*, 157 F. Supp. 2d 1044, 1055 (N.D. Iowa 2001) (internal quotations and citation omitted); *see United States v. Clayton*, 787 F.3d 929, 933 (8th Cir. 2015) (noting that to receive a new trial based on prosecutorial misconduct, a defendant "must show that the government's

14

conduct was improper and that it affected the defendant's substantial rights so as to deprive him of a fair trial") (internal quotations and citation omitted).

Tavlin also asserts that the Government impermissibly used Farahan's guilty plea as evidence of Tavlin's guilt. The Court disagrees. "[Farahan's] guilty plea was mentioned repeatedly by both the prosecution and the defense; the defense sought to question [Farahan's] credibility by emphasizing that he might obtain a reduced sentence for cooperation with the prosecution, and the prosecution presumably wished to rebut the defense's attempt to impugn [Farahan's] credibility." *United States v. Carson*, 560 F.3d 566, 575 (6th Cir. 2009). Just like in the *Carson* case, cited by Tavlin, the Court concludes the Government's statement in the rebuttal was "intended to address [Farahan's] credibility." *Id.* And even if the statement did constitute error, the Court clearly instructed the jury in the final jury instructions that "[y]ou must not consider [Farahan's] guilty plea or plea agreement as any evidence of Tavlin's or Gantman's guilt. You may consider that witness's guilty plea only for the purpose of determining how much, if at all, to rely upon his testimony." (Doc. No. 209 at 9.)

Finally, Tavlin argues that the Government deliberately allowed Farahan to lie on the stand. Tavlin points to three statements made by Farahan. First, Farahan said that he valued Tavlin's input when he bought and sold Mazor stock in 2016 and 2017 because Tavlin was "part of the company." (Doc. No. 221 at 94.) Tavlin, however, did not join the company until the fall of 2017. When asked about this on cross-examination, Farahan acknowledged that the testimony was "incorrect" and that he was confused about "the timeline." (Doc. No. 222 at 33.)

15

Second, the Government asked Farahan if Tavlin's May 16, 2018, text message that said, "Sell if possible," referred to Mazor. (Doc. No. 221 at 105-06.) Farahan said, "I believe so." (*Id.* at 106.) On cross-examination, Farahan acknowledged that he may have been mistaken. He said, "If I didn't have [Mazor stock at the time], it must have been about other stocks." (*Id.* at 199.) He said it was likely "related [to] other stocks that [he] also got from Doron." (*Id.*)

Third, and lastly, Farahan stated that a June 2018 check he made to Tavlin's son, Ryan, related to "stock tips that [Tavlin had] given" Farahan. (*Id.* at 110.) Farahan asserted that the check related, in part, to trading of Mazor stock. (*Id.* at 107-08.) Farahan further testified that he and Tavlin lied on the check and said it was for the "purchase of rugs" because Tavlin was, at the time, an insider at Mazor. (*Id.* at 107-110.) During in cross-examination, Farahan testified that the check involved investments that did not involve insider trading. (Doc. No. 222 at 58.)

Overall, Tavlin points to minor instances of Farahan misstating the facts or providing inconsistent testimony. None of the statements appeared to be deliberate, and, when pressed about the statements, Farahan corrected himself. These minor inconsistencies do not indicate an intention to lie under oath. But regardless, there is not a reasonable likelihood that the statements affected the jury's judgment.

## ORDER

Based upon the record before the Court, and the Court being otherwise duly advised in the premises, **IT IS HEREBY ORDERED** that:

16

1. Defendant Tavlin's motion for judgment of acquittal (Doc. No. [242]) is respectfully **DENIED**.

2. Defendant Tavlin's motion for a new trial (Doc. No. [243]) is respectfully **DENIED**.

Dated:  August 23, 2024               s/Donovan W. Frank
                                      DONOVAN W. FRANK
                                      United States District Judge